133149, Rusty Adams Jr. et al. v. Anheuser Busch Companies, Inc. Art has not received 15 minutes of his time. Mr. Spitz, floor comments. Good afternoon. Okay, now we get to the arisicates. That's right. That's right, Your Honor. Yeah, I was bucking with excitement. I can tell by the look on your face. Before I begin, I'd like to reserve five minutes for rebuttal. That's fine. Thank you, Judge Cole. May it please the Court, you've been presented with three interpretations of the phrase employment with the controlled group is involuntarily terminated in this case. The plaintiff's interpretation gives full and ordinary meaning to every word in that phrase and only every word in that phrase. The district court's interpretation at page 22 of its decision refers to some other job with some other company that's not only unreasonable, it's nonsensical. Anheuser Busch's interpretation violates the standard contractual interpretation rules by trying to subtract words that are in the phrase and adds words that aren't in the phrase. Because the plaintiff's interpretation of the phrase at section 19.11F is the only reasonable interpretation as a matter of law, the district court's decision below must be reversed. Apparently the district judge got the notion that this was some kind of unemployment compensation provision. Where did that come from? Was that the defendant's argument? Or did that just come out of the air somewhere? Well, I think there's two things. One is I do think some of it came out of air. I mean, I don't think there's any disagreement that this is a pension plan. And some of the cases that we're going to talk about here today are severance cases, but that's not what's going on here. This is a retirement plan case. But I do think that if he got confused at all, it may have been very well because of the argument that the defendants are making. As we pointed out in our brief, the point that they seem to be making is that job loss is the trigger, but job loss isn't the issue here. The issue is how many credits do these retirees get when they retire, be it whenever that age, whenever that day comes, and do they get age and service credits towards that? That's fundamentally what these plaintiffs were terminated from. There's no real question. One of the things about this case is that there's so little that's actually in dispute in this case, that everyone agrees that the plaintiffs were in the controlled group on the date the change in control happened when IMBEV acquired Anheuser-Busch. And everyone agrees that they weren't in the controlled group after the sale of these four plants to Ball. And everyone agrees that that change was involuntary. And everyone agrees that Section 5.1 of the plan, which is the termination provision, was triggered, which was triggered when, quote, employment with all members of the controlled group terminates for any reason, unquote. And so the only question in light of all those undisputed things is what does employment with the controlled group as involuntarily terminated mean at Section 19.11F? The other thing that should not be in dispute in this case is the standard of review, which is de novo initially.  And the question that we think starts and ends this case is what does Section 19.11 mean as a matter of law, which is a de novo review? I think part of the problem here is that the argument from Anheuser-Busch and the decision of the district court sort of flips those things on its head. Did Ball have, Ball did not take over anything with respect to the pension system, right? That's correct, Your Honor. And these people kept their jobs with a new employer. That is true. And did they get, and they, the next day they were day one employees with a new employer? That's correct. That's right. What they were terminated from was the controlled group, the family of Anheuser-Busch companies, which practically speaking for them meant they have a new employer with a different benefit plan and the credits that they were earning and the age that they were earning credits towards this pension plan were cut off. Why did the company amend the plan to provide for this? Well, that gets us to the intent back in 2000. And it appears from the record that they were trying to protect the employees. Now, they didn't anticipate that this scenario would occur. That's in the record as well. But what fundamentally at the time, the pension plan was overfunded. And so there was a mix between fear that an acquirer would get the overfunding, they didn't want that, but they also wanted to ensure that the participants were protected. That's how this provision comes along. But in the event of what? Were they afraid that they were going to be taken over? Were they afraid that a division was going to be sold? I mean, what was the fear at that time? Well, that the pension plan was overfunded. This was passed in 2000. And if you remember back that far, the market was doing very well and you had the Internet boom. And so the pension plan had like one and a half times its assets. And so I think that they were concerned about those funds going to an acquirer. Attracting somebody to come in and acquire it, is that it? I think that was part of the issue, Your Honor. I think the other part of it was, and the notes that are in the record reflect this, from Anheuser-Busch's committee's interview with the person who they interviewed, was that August Bush III, the CEO at the time, didn't want that money to go to anybody other than the participants. Let's say for the purpose of argument that the court were to conclude that that phrase is ambiguous, that there is ambiguity. How do you prevail then in terms of the arbitrator, the committee's decision? Wouldn't the committee's decision not be arbitrary and capricious at that point? If it has to look to other evidence, extrinsic evidence, other things? So I guess the bottom line is, let's just say there's ambiguity. Where does that leave you? That leaves us with the plaintiffs prevailing anyway. Because even if we could cobble together some sort of interpretation, the Shelby County case that we cited is a case where the court concluded, this Sixth Circuit concluded, that there could be ambiguity within the phrase that was at issue. That was a subrogation provision in a health care plan. The point is that you have to be presented with a reasonable interpretation. And you don't have one here from the district court, and you don't have one here from Anheuser-Busch. And so my response directly to you, Judge Cole, is to say that Shelby County tells us that just because we can create some sort of ambiguity here does not mean the plaintiffs don't win. Was there extraneous or extrinsic evidence on what the parties meant when this section 19.11, whatever the subsection number is, F was cobbled together? I know someone testified who was maybe general counsel at the company back around that time. And there was other evidence that might support the notion that there was at least some ambiguity as to whether termination meant loss of job versus just simply terminated by that one employer and ending up working for another employer doing essentially the same work. Sure. I think the other evidence you might be thinking of is the board resolution. I think it was. Yeah, and there's the board meeting minutes that talk about this. And my response to that is very simple. If ERISA's about one thing, you know, I'm an ERISA lawyer, I get these questions all the time, and I try and tell people if ERISA's about one thing, it's about plan documents. It's about what the plan says. And so I think at the end of the day, what happened here was that in 2000, the board passed whatever it passed, and it was implemented into the plan, and the plan now governs. And the plan says employment with the controlled group is involuntarily terminated. Well, okay, but the other interpretation that they put on it is that employment with the controlled group is your job. And so if your job is involuntarily terminated, you get the benefits. And why is that not one plausible reading? And, Judge White, I have two responses to that. And the first is that by adding the word job or position, they've added those words into a provision that doesn't have them. The second is- No, no, no one is saying they're adding the word. You're saying what does your employment with the controlled group mean? It means everybody has a different employment with the controlled group. This is your employment with the controlled group. This is yours. This is yours. It means your job. And that doesn't add words. I see the amount of time I have. Thank you. I think the answer to that is found in Section 5.1. In Section 5.1, that is the termination provision. And there's no dispute in this case when the termination provision says employment with all members of the controlled group terminates for any reason. That happened. And they got, also in the record, benefit statements after they were terminated from the controlled group that say the date of termination from employment was 9-30-09. And so this notion that being terminated from the controlled group means something different at 1911F than it means at 5.1 or that is commonly understood in the cases that we've cited, like International Paper and Bending House and the other cases that have that specific language in it, I don't think is reasonable as a matter of law. Okay. Your initial time has expired, but you will have your rebuttal time. Absolutely. Thank you. Good afternoon. To please the Court, I'm Ed Crane representing the plan. And I would like to start with one area of disagreement with the Court's permission, and that is the standard overview. Because I didn't think that there was a dispute that the plan documents here give discretion to the administrator and the plan committee to exercise discretion to interpret the plan and to decide benefits. And in that context, ERISA law is clear that the standard overview for the administrator's decision, and in this case the appeals committee's decision, is the arbitrary and capricious standard overview. Right. But we review the question of ambiguity de novo. And thank you, Judge White. And as Judge Graham did in the district court, we would suggest that the review be conducted the way that he conducted it, which is to look at what the committee did, look at the plan, look to see if it was an unreasonable construction, and then look to test the ambiguity point, which he did, and concluded that the phrase was ambiguous on its own, the key phrase, shall I say, and also it was ambiguous in the context of the overall plan. And that was his conclusion. Well, can you look to the overall plan if the meaning of the term is clear and not ambiguous? I mean, I don't ‑‑ I'm struggling to see what's ambiguous about this. Yes. Good question, and I'll try to help. Thank you. It's my privilege. If you look at the change in control provision, which is 19.11, that was adopted in 2000. And the language in that plan, specifically in subpart F, says employment with the control group is involuntarily terminated. That's what it says. If you look at a provision earlier in the plan, which is 3.1A, which deals with service credit, how long you are in the plan, 3.1A has language in it that specifically says for that purpose, solely for that purpose, that if there's a sale of a business unit or a sale of assets and that an employee is terminated in connection with that, that for the purpose of his accredited service, that that would be considered a termination. It does not have that language in 19.11F. And the plan administrator, when it looked at the plan, said, no, wait a minute. In 19.11F, it says involuntarily terminated. In 3.1A, it specifically addresses the circumstance that we have here with these employees. And it says that for 3.1A, that's considered a termination, but it doesn't say that for 19.11F. But what about 5.1A? Yes. It talks about termination with all members of the control group. Yes. I'm happy to, I'm sorry, did that answer your question, Judge? Well, why don't you deal with this and then we'll. Okay, I'll deal with this, Judge White. 5.1 applies to benefits under the plan that are not the enhanced benefit that we're talking about in 19.11F. That's exactly what Judge Graham found, and he was correct in that interpretation. So 5.1 deals with the sections in 19.11 that are A through D, I believe. And 19.11D, Judge White, deals with the accrued benefit of the employees. That's whatever they'd accrued up to that point in time, and all the employees got that benefit. There's no dispute about that. But 5.1 does not address the enhanced benefit that's in 19.11F. And that's why that language in 5.1 is not controlling with reference to 19.11F. Back to Judge Dodd? Yes. No, it's okay. Okay. Judge Call? No? All right. Then I'll proceed. In any event, one of the most important things we believe here is that Judge Graham, in his review, concluded there was no abuse of discretion, and he said that the decision by the committee was based on a deliberate and principled reasoning process, resulted in a rational decision, supported by substantial evidence, untainted by conflict of interest considerations. That was his conclusion in a 50-page memorandum opinion and order. In the course of that work, in applying this most deferential standard, Judge Graham conducted thorough, rigorous, and at times a painstaking analysis of this plan, and the evidence in the record to support the plan. And, in fact, in many respects, I'd submit respectfully that Judge Graham's analysis tracked that of what the appeals committee did when it addressed this decision, because it followed a process that considered much evidence and interpreted the plan in accordance with that evidence. And I think that's important for the Court to know. Okay. Let me see if I really understand this. So you're saying that these enhanced benefits do not come to retirees unless they are terminated from the control group and do not manage to get another job? They have to lose their job to get those benefits. They have to lose their job. That's what the committee concluded, and that is our position. All right. So this assumes that they lose their job with the controlled group and they don't get another job. Is that right? It assumes that they're fired from their job with the controlled group and not transferred to a successor purchaser. Well, this wasn't a successor. Or to a purchaser of assets or businesses is an ongoing concern. Let me say this, Judge. The best record evidence of that is that the plan did in fact pay out enhanced benefits to more than 1,200 employees of Anheuser-Busch who were fired from their jobs as a result of the change in control. And who then retired. Pardon me? And who then retired. No, who may have done whatever, who may have retired, who may have opened bike shops, who may have, God forbid, gone to law school, whatever. But they didn't get any money at that point. All they got was money down the line when they became qualified for the retirement plan. No, no. No, they got all of the accrued benefits that were in place. That's Section 1911A through D, I believe. And then they also got the enhanced benefit, which was in 1911F, which is credit for an extra five years of service and an extra five years of age. They got all of that at that time. I'm really totally confused now. Somebody is working for the controlled group and they are involuntarily terminated when the sale goes through. Somebody showed up and paid them money? They got the enhanced benefit under 1911F, yes. Money? Did they put it in their pockets and walk off? I think it was optional for the employees, wasn't it, David? I'm sorry. I think that they got either a payment, a lump sum, or they got to hold on for pension benefits in the future. What if somebody were 30? If somebody in that situation were 35, that person maybe wouldn't have gotten their benefits, but they would have got accrued years. I think that's right. The point I was making, Judge Daughtry, was that where people were actually fired from their jobs, they were given the enhanced benefit by the committee, by the plant administrator, but it was not given to employees whose jobs were transferred to other employers. To any other employers or just the person who bought the? In this case, to Ball Corporation. The people who kept their jobs at Ball Corporation. Okay. But if you weren't hired by Ball and you went out and started working for Coors, they wrote you a check? Again, I believe they had the option of staying in the plant or taking a lump sum distribution. Okay. And if they took a lump sum settlement, they didn't get the enhanced benefits or they did? They did. If they were fired, they did. Anybody who didn't go to Ball got the benefits? Anybody who was fired from their jobs got the benefits. The Ball transaction was one transaction. So those people did not lose their jobs. There were other transactions as well where people were transferred to the successor employer and they did not get the enhanced benefits. Why would they be rewarded and the people who went to work for Ball would not be rewarded? This is not making sense at this point. One of the questions earlier, and maybe this will help, Judge Daughtry. Yeah, you need help. Apparently I'm not helping very much, but I am trying. No, keep trying. Sometimes I'm a little slow on the uptake. I am as well. But let's just say this. One of the questions before was what evidence is there in the record of the intent of the change in control provision? And I'll answer that question now. The evidence in the record is that in 2000, way back in the year 2000, and what a difference 14 or 15 years makes, the pension fund was indeed, this is the celerity employees pension fund, was indeed overfunded. And August Bush III, who was then CEO of Anheuser-Busch, wanted to ensure that that pension fund did not act as a lure for a hostile takeover. Right, we've got that. Okay. But also wanted to protect the rights of employees in the plan to get the benefits therein. But the record evidence is that although this is a pension benefit in terms of the plan, that at least in that sense, both the pension committee of the board and the board of directors looked at it as almost a severance event and said, we want this enhanced benefit along with these other change in control provisions to be available for people who are, in the words of the pension committee of the board, displaced. That's what the pension committee said. In the full board resolution that's also in the record, the board said we want this enhanced benefit available for people who are terminated, who are involuntarily terminated as a result of a change in control. When Ball took over, that was the end of their involvement in the ABC pension plan. They were now in the Ball pension plan, starting from square one. How is that different from the guy that went to work for Coors? He's no longer in the ABC pension plan. He's year one in the Coors plan. Because the guy going to work for Coors was fired from his position at Anheuser-Busch while the people who were working for Ball were not. They kept their jobs with the transfer. He wasn't fired. He just wandered off and decided to work for Coors. Oh, no, no, no, no, no, no. This is involuntarily terminated, involuntarily terminated. But he was involuntarily terminated because the sale went through. Or he was involuntarily terminated because he had a job offer with Ball and didn't take it. All right. I've got your argument. It remains to be seen whether I'm convinced, but I'm trying here. Thank you, Judge. I appreciate that. I'm giving it my best shot. I'm trying to explain it as best I can. It seems to me that what was happening here was an overfunded pension plan that might have lured a takeover, a hostile takeover. And the best way to avoid having that huge amount of money look like the honeypot to somebody who wanted to take over the company was to obligate it to people who would get the benefit of it in the event that something happened where there was a takeover and they were therefore terminated involuntarily, or there was maybe a sale. They were trying to put a fence around that money so that nobody was going to be lured into trying to take them over. What's wrong with that interpretation of what happened? I don't dispute that interpretation. The question is what benefits flowed from that. And if you look at the change in control provision, 1911, A through D, everybody got the benefits. The question is whether people got the enhanced benefits under 1911F. And the record evidence shows that at the time the board adopted the resolution, that the board's intent was that that enhanced benefit, because everybody had gotten their accrued benefits in the plan, that enhanced benefit would go to people who actually lost a job. If that were their intent, then one would have expected that they would have articulated it in a fashion that was even a little bit, that would give just a little bit of a clue that that's what they meant. I mean, anybody reading this would assume it means you're terminated from the control group. I mean, you really have to, I understand that argument, but I'll tell you, it's one that you don't see until someone makes it. And it's not, if you gave this to ten people, all ten of them would say what it means, that it's terminated from your employment with the control group. You know, you have to sort of come up with this idea. I mean, so if that's what they meant, that, look, we're going to give this to the people that lose their jobs and don't get transferred over, then you'd think that's what they would say, terminated from, who lose their job by virtue of this change of control. My red light's on. May I continue? You may ask your question. It's ambiguous. I don't dispute that. It is. Could it have been written more clearly? Probably. But this is what the administrator determined. It's what the appeals committee determined. And it's what the district court determined. So I don't see it as any sort of unreasonable interpretation. And, in fact, if you look at the case law in this circuit that deals with the phrase involuntarily terminated, there are plenty of cases in this circuit that say a decision by a plan administrator, which requires the phrase involuntarily terminated to require a loss of a job, that's a perfectly reasonable construction. And I'm thinking of the Blakeman case. I'm thinking of the Roe case, by the way, which was decided under both standards. The Roe case, first time the Sixth Circuit addressed it as arbitrary and capricious. It was a standard. And the court said it was not arbitrary and capricious to result in the benefit denial. Then it had to consider it on a de novo review, and the court said under a de novo review. It's an appropriate decision. The problem here isn't involuntarily terminated. It's the clause, your employment with the control group is involuntarily terminated. And I'm suggesting, Judge White, most respectfully, that the phrase involuntarily terminated in and of itself creates ambiguity. So a quick question and hopefully a quick answer. If we were to find no ambiguity in terms of that phrase, where does that leave you? We win. We win. If we find no ambiguity? We win under a de novo review standard. Oh, I'm sorry. No ambiguity? No ambiguity. Judge White. I'm sorry, Judge Cole. I had heard your question to be applying a de novo review, so I misanswered it. I answered it incorrectly. Okay. The answer to that is in order to come to that determination, you would have to ignore all the record evidence about the intent of the drafters, about the ambiguity in the plan documents. You'd have to reconcile it with 3.1A. But if you — If we're not looking at extrinsic evidence, if we're looking at just the literal terms of the plan and just for purposes of questions — Then you'd be substituting your judgment for that of the — Well, so let's just say a panel of the court found there was no ambiguity. Yes. Where does that leave you? You would be substituting your judgment for everyone else. No, no. Where does that leave you? No. Where does that — If you're saying there's no ambiguity in that phrase? Mm-hmm. Right. I still do not believe that the enhanced benefit gets paid out. Okay. Okay. Why? Pardon me? Why? Because I believe that that phrase means people have to have lost a job in order to get the enhanced benefit. Okay. Okay. I think that's what — Okay. That's a fair construction and a fair read of the plan. That's fine. Great. And I thank you all very much. Thank you, Mr. Fray. We appreciate your argument. Mr. Stitt. I think the fundamental problem here in this case is the fundamental problem that you just heard from Counsel for Anheuser-Busch. Yes. He thinks they didn't lose their jobs. Right. And the issue here is did they lose their jobs with the controlled group. Right. And they want you to look at extrinsic evidence, as he first pointed out in his very first point to you, and then backtrack to the plain and unambiguous language of Section 1911F to try and then say what it means. They intend, and what they want you to do, is to take arbitrary and capricious standards and look to extrinsic evidence and then decide whether or not the phrase is ambiguous. Wait a second. We've got it. Would you agree that in deciding whether a provision is ambiguous, you can at least and should look at the four corners of the plan, not necessarily just that clause, but you look at the plan as a whole? You can. If that is helpful. And if that leads to an ambiguity, then you have an ambiguity. Perhaps. And I don't disagree with that general point. But I did not understand their argument with respect to Section 3.1 because essentially they're asking you to say that there's this clause in the severance provision at 3.1 which isn't in Section 1911F. Well, the problem with that argument is Section 5.1, which is the termination provision, which doesn't have any of the things that Mr. Crane was talking about, and no one has any doubt at all that these people were terminated under Section 5.1. And so, Judge White, when you look to the four corners of the entirety of the plan, there's nothing inconsistent at all with plaintiff's interpretation of Section 1911F. In fact, it is consistent with Section 5.1. And the Section 3.1 problem is essentially what I was talking about when I was up the first time. They're never going to earn any more credit, age credit, service credit, in this plan. That's all that's at issue here. There's nothing in the record about people getting money and getting lump sums. Kevin Jones, who was 34 on the date of termination, one of the named plaintiffs in this plan, is going to have to wait a very long time until he's eligible for retirement. The other three named plaintiffs have at least five or six or ten years to go before they get that. I don't know where this people got lump sums argument came from, but it's certainly not in the record here. The case law confirms that their interpretation is wrong. If this phrase said, involuntarily terminated, period, like the Meade case that I thought I heard counsel talk about, or some of the other cases that they cited, we wouldn't be here. That phrase, standing alone, may very well be ambiguous, but the point of those cases is to say, okay, it's ambiguous because we don't know which we've been terminated from. Is it terminated from anything? Is it terminated from all positions? Is it terminated from the specific company? That's why Wolfe was ambiguous. That's why Easterly was ambiguous. That's why the Meade case was ambiguous. The question is then terminated from what? And the plan says at 1911F what the what in this case is, the controlled group. They were terminated from the controlled group. The plan told them they were terminated from the controlled group, and they simply don't like the outcome, which is why we urge you to reverse the district court's decision below and order the case back to the district court to enter judgment on the administrative record in favor of the plaintiffs. Thank you very much. Okay. Thank you, counsel, both of you, for your arguments today. We very much appreciate them. The case will be submitted.